# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:20-CR-00107 |
| v. | (Chief Judge Brann) |
| BRENDA RAMIREZ-MENDOZA, | |
| Defendant. | |

## MEMORANDUM OPINION

### OCTOBER 1, 2021

Pending before this Court is Defendant Brenda Ramirez-Mendoza's motion to suppress evidence obtained as a result of a search of her vehicle, and statements made during a traffic stop.[1] Ramirez-Mendoza is charged with possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and illegal reentry in violation of 8 U.S.C. § 1326(a).[2] On April 13, 2021, this Court held an evidentiary hearing on Ramirez-Mendoza's motion.[3] Following the Court's full consideration of the record, Ramirez-Mendoza's motion will be denied.

## I.    BACKGROUND

On February 11, 2020, Corporal Mark Conrad of the Pennsylvania State Police initiated a traffic stop of a vehicle driven by Ramirez-Mendoza on Interstate 80 ("I-80") in Union County, Pennsylvania.[4] Conrad chose to conduct a stop because

---

[1]   Doc. 28.
[2]   Doc. 14.
[3]   Doc. 43.
[4]   Doc. 51 at 9:25, 13:4, 14:23.

Ramirez-Mendoza was driving above the speed limit and he suspected that her vehicle's window tints were illegal.[5] While standing by Mendoza-Lopez's car, Conrad observed that there were two cell phones in the car's center console area and a single key in the ignition.[6] Conrad also detected a strong odor of air freshener emanating from the vehicle.[7]

Ramirez-Mendoza's primary language is Spanish, which Conrad does not speak.[8] The two thus communicated primarily in their own respective languages.[9] The Government provided a transcript of their conversation, of which the Spanish portions were translated into English by a Federal Bureau of Investigation ("FBI") linguist.[10] The Government chose not to call the FBI linguist as a witness, and Conrad, who cannot speak Spanish, was unable to confirm that the transcript's translations were accurate.[11] But Spanish is a complex language, and its translation necessarily relies upon context and dialect. Without testimony regarding the linguist's method of translation, the Court finds it inappropriate to presume the

---

[5]   *Id.* at 14:23.
[6]   *Id.* at 23:14-15, 62:23.
[7]   *Id.* at 23:17-18.
[8]   *Id.* at 74:12, 75:19.
[9]   *See generally* Hr'g Gov't Ex. 2.1.
[10]  Doc. 51 at 68:11.
[11]  *Id.* at 69:14, 69:18. The Government in fact pointed out Conrad's lack of competency on this subject. *Id.* at 73:3-4.

transcript's accuracy.[12] Accordingly, the Court shall rely on the transcript only to the extent it reflects the English portion of the conversation.[13]

When Conrad initially stopped Ramirez-Mendoza, he communicated with her in English without the help of Google Translate or any other linguistic aid.[14] Conrad asked for her license and registration, whether the car was hers, and about her travel plans.[15] When he asked Ramirez-Mendoza where she was from, she said New York.[16] He then asked from which part, to which she responded in Spanish.[17] Conrad then stated that he does not speak Spanish, and Ramirez-Mendoza attempted to reformulate her answer in English by saying: "[u]m, is from my boyfriend, because the 14th, the Friday, so, it's for the, uh, present."[18]

Shortly thereafter, Conrad asked Ramirez-Mendoza to exit the car and stand by the passenger window of his patrol vehicle.[19] He subsequently began using Google Translate, a translation app on his phone.[20] Their process of communication

---

[12] *See United States v. Matlock*, 415 U.S. 164, 175 (1974) ("[T]he judge should receive the evidence and give it such weight as his judgment and experience counsel."). Relevant to the Court's conclusion is the relative ease with which the Government could have called the linguist to explain her methodology, and the level of precision required in the Court's analysis. The Court also notes the dialectical disparities inherent to Spanish (like any language) which may impact the interpretation and translation of various words.

[13] Conrad testified that the transcript was substantially accurate. Doc. 51 at 49:24.

[14] Doc. 51 at 15:14-16.

[15] Doc. 33-2 at 1.

[16] *Id.*

[17] *Id.* The FBI linguist translated her answer as "I'm going to spend February 14th with my boyfriend." *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.* at 1-2; Doc. 51 at 18:17-19, 20:4.

from this point on was as follows: Conrad would speak English into his phone, the app would translate his statement into Spanish, and then verbalize the translation and display it on Conrad's phone.[21] The same process occurred, but in reverse, when Ramirez-Mendoza spoke into the phone.[22] Conrad held the phone at all times.[23]

Because Conrad does not speak or understand Spanish, he did not and could not confirm whether Google Translate accurately interpreted and articulated what he was saying.[24] Though acknowledging that his department uses consent forms (documents which a suspect signs authorizing the police to search her vehicle), Conrad did not consider using one or checking whether one was available in his car.[25] Nor did Conrad consider whether a Spanish-speaking interpreter was available to assist.[26] In addition, Conrad had a drug-sniffing dog in his patrol vehicle throughout the stop.[27] However, he failed to explain at the hearing why he did not use it prior to asking Ramirez-Mendoza if he could search her car.[28]

Using the app, Conrad uncovered that Ramirez-Mendoza was not from New York but from California, and that she was traveling to New York to visit her

---

21  Doc. 51 at 71:21, 72:1.
22  *Id.*
23  *See generally* Hr'g Gov't Ex. 2.1.
24  Doc. 51 at 76:10.
25  *Id.* at 67:7.
26  *Id.* at 67:3.
27  *Id.* at 33:3-11.
28  *Id.* His explanation was that he did not need to use the dog because Ramirez-Mendoza ultimately gave him consent. *Id.* But this answer is puzzling as consent would have been given approximately twenty minutes after the stop began.

boyfriend.[29] She intended to stay only for the weekend and had passed through Arizona, Texas, and Indiana over the past three days.[30] Ramirez-Mendoza revealed that she had been stopped by police while in Arizona and that the officers had searched her car with a drug dog.[31] She later confirmed at the suppression hearing that she had in fact consented to the search.[32] Neither party provided evidence elaborating on the circumstances of the search in Arizona.

Near the beginning of the conversation, Ramirez-Mendoza provided Conrad with false identification.[33] During the stop, and during a subsequent interrogation with a different officer, Ramirez-Mendoza pretended to be a different person, Carla Nava Garcia, who was pictured in a Mexican driver's license.[34] Conrad testified that he did not believe that Ramirez-Mendoza was the person identified by the license.[35] He became more suspicious when Ramirez-Mendoza informed him that the car was registered in the name of Denisse Ramirez,[36] but was given to her by a friend named Lissette Acosta.[37]

In general, Conrad and Ramirez-Mendoza were able to communicate using Google Translate reasonably well despite some confusion arising from apparent

---

[29] Doc. 33-2 at 2-3.
[30] *Id.* at 3, 10.
[31] *Id.* at 11-12.
[32] Doc. 51 at 100:24.
[33] *Id.* at 118:8.
[34] *Id.* at 16:12, 118:19.
[35] *Id.* at 16:18-19.
[36] *Id.* at 16:24-25.
[37] *Id.* at 21:10.

mistranslations. For example, when asked what address Ramirez-Mendoza was driving to in New York, the app translated her response into English as "[m]y boyfriend is a trailer; he doesn't live there."[38] After some back and forth, she was able to clarify that her boyfriend was a truck driver.[39] It seems, however, that Google Translate was unable to adequately translate the word Ramirez-Mendoza used to describe her boyfriend's occupation.[40]

Google Translate produced several other Spanish-to-English mistranslations. One occurred when Conrad asked if Ramirez-Mendoza planned to drive back to California with her boyfriend. Google Translate interpreted her as responding "[b]ecause the one in New York goes Kentucky from fifth and leaves Texas."[41] Another was when Ramirez-Mendoza's answer to the question of what hotels she had stayed in was translated into English as "[d]on't let and grab another one in Indiana . . . and the other—other hotel in Indiana."[42] A minor word-level mistranslation appears to have happened when Google Translate interpreted Ramirez-Mendoza as saying she planned to "mark" her boyfriend.[43]

---

[38]  Doc. 33-2 at 6.

[39]  *Id.*

[40]  *Id.* The FBI linguist translated her as stating "trailer driver," but Google Translate interpreted this as "trailer." *Id.*

[41]  *Id.* at 8. The FBI linguist translated her as stating "No . . . [b]ecause from New York he is going to Kentucky and from Kentucky he is going to Texas." *Id.* at 7-8.

[42]  *Id.* at 10. The FBI linguist translated her as stating "I got a hotel in Texas and I got another one in Indiana." *Id.*

[43]  *Id.* at 9. The FBI linguist translated her as stating that she planned to "call" him. *Id.* at 8.

The app also produced several English-to-Spanish mistranslations. Though more difficult to capture without a verified transcript, these mistranslations are evidenced by instances where Ramirez-Mendoza gave strange answers in response to or needed clarifications of Conrad's inquiries. For instance, when asked "[w]here is the friend that owns the car?" she responded, "she is friend."[44] When asked the name of the car owner, Ramirez-Mendoza replied "[m]y friend."[45] Additionally, Conrad's question asking if Ramirez-Mendoza had been "stopped by" the police was translated to "go by" the police.[46]

Ramirez-Mendoza was able to answer two questions in English. Both answers responded to questions posed in English which were translated by Google Translate into Spanish. The first occurred when Conrad inquired into when Ramirez-Mendoza had left California and asked: "[t]hree days? How many days ago?"[47] In English, Ramirez-Mendoza said: "[d]riving? Three days."[48] The second occurred after Conrad asked: "[i]s that the only hotel you got? Was in Indiana?"[49] After unsuccessfully attempting to respond in Spanish, Ramirez-Mendoza stated in

---

[44] *Id.* at 4. The FBI linguist translated her as stating "it's a girl-friend." *Id.*

[45] *Id.* at 5. The FBI linguist translated her as asking "[m]y girl-friend?" before saying "[m]y girl-friend." *Id.*

[46] *Id.* at 11-12. The FBI linguist translated Conrad as stating "where [sic] you stopped by the police at all since you left California" and Google Translate's interpretation as "[w]ill you go by the police since you left California." *Id.* at 11.

[47] *Id.* at 9.

[48] *Id.*

[49] *Id.* at 10.

English: "[o]ne hotel in Texas, in Amarillo . . . and the other—other hotel in Indiana."[50]

Later in the stop, Conrad asked Ramirez-Mendoza if she had anything illegal in the car.[51] She responded no.[52] Conrad then said: "would like to search the car to make sure, okay?"[53] Google Translate converted this into Spanish, and from the video recording, it appears that the word "*registrar*" was used in place of the phrase "to search."[54] The FBI linguist translated the app's Spanish translation into the statement: "I like to search the car to make sure that it is all right."[55] Again, however, the Government did not offer any testimony to verify the accuracy of this translation.

Ramirez-Mendoza then responded "uh-huh" and nodded her head.[56] Conrad subsequently directed her to the shoulder of the highway and proceeded to search the vehicle.[57] In the car, he found a large package of fentanyl.[58] Ramirez-Mendoza testified that she believed that Conrad had meant "I like check the cars, revise the cars" and that she did not understand this to mean that he intended to search her vehicle.[59] She acknowledged that she had responded that it was "fine" because he had not indicated to her that he was asking to look inside the car or through her

---

[50] *Id.*
[51] *Id.* at 13.
[52] *Id.*
[53] *Id.*
[54] *See* Hr'g Gov't Ex. 2.1. Of note is that the word "*buscar*" was not used. *Id.*
[55] Doc. 33-2 at 13.
[56] *Id.*
[57] Doc. 51 at 28:15-16.
[58] *Id.* at 30:11-12, 32:9.
[59] *Id.* at 99:7-8.

belongings.[60] In any event, at no point did Ramirez-Mendoza protest the search or ask for clarification.[61]

## II.     VEHICLE SEARCH

The Fourth Amendment protects individuals from unreasonable searches and seizures.[62] Warrantless searches are generally unreasonable unless they fall within one of several categorical exceptions to the warrant requirement.[63] Consent searches and car searches constitute two such exceptions.[64] Ramirez-Mendoza argues that the search of her vehicle was unlawful because she did not consent to the search and because the search was not supported by probable cause.[65]

### A.     Consent

A search conducted with a suspect's consent is valid even where unsupported by a warrant or probable cause.[66] Consent must be voluntary, may be express or implied, and is evaluated in light of the totality of the circumstances.[67] The Government bears the burden of proving consent by a preponderance of the evidence.[68] This burden cannot be met "by showing a mere submission to a claim of

---

[60]  *Id.* at 112:4-7.
[61]  *Id.* at 101:10-18.
[62]  U.S. Const. Amend. IV.
[63]  *Fernandez v. California*, 571 U.S. 292, 298 (2014).
[64]  *Id.*; *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2012).
[65]  Ramirez-Mendoza agrees that the initial stop, as well as Conrad's decision to extend the stop, was supported by reasonable suspicion. Doc. 38 at 1.
[66]  *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011).
[67]  *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005).
[68]  *United States v. Price*, 558 F.3d 270, 277-78 (3d Cir. 2009).

lawful authority."[69] While proof that a suspect knew that she had a right to refuse a search is not necessary to find consent, knowledge may be a "highly relevant" factor.[70] Other factors to consider include the age, education, and intelligence of a suspect,[71] as well as the suspect's "possibly vulnerable subjective state."[72]

Another factor, of particular importance here, is the existence of a language barrier.[73] An officer's inability to converse with a suspect in a common tongue poses special problems where the officer attempts to solicit the suspect's consent to a search. This is because difficulties in communication tend to make it harder to determine whether consent was actually provided, and if it was, whether it was voluntarily given. Nevertheless, voluntary consent has been found where the evidence demonstrates that the suspect signed a foreign-language consent form,[74] the suspect could speak or understand English,[75] or the police officer could communicate reasonably well with the suspect in her native language.[76]

---

[69]   *Id.* (internal quotation marks and citations omitted).

[70]   *United States v. Mendenhall*, 446 U.S. 544, 558-59 (1980).

[71]   *Price*, 558 F.3d at 278.

[72]   *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973).

[73]   *United States v. Caraballo*, 643 Fed. Appx. 163, 169 (3d Cir. 2016) (citing *United States v. Sriyuth*, 98 F.3d 739, 749 (3d Cir. 1996), *cert. denied*, 137 S. Ct. 100 (2016).

[74]   *E.g.*, *United States v. Velasquez*, 885 F.2d 1076, 1082 (3d Cir. 1989); *United States v. Caraballo*, 643 Fed. Appx. 163, 169-70 (3d Cir. 2016).

[75]   *E.g.*, *United States v. Cedano-Medina*, 366 F.3d 682, 687 (8th Cir. 2004); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1163 (10th Cir. 2001); *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999); *United States v. Sanchez-Valderuten*, 11 F.3d 985, 990-91 (10th Cir. 1993); *United States v. Oguns*, 921 F.2d 442, 448 (2d Cir. 1990); *United States v. Massac*, 867 F.2d 174, 177 (3d Cir. 1989); *Caraballo*, 643 Fed. Appx. at 169; *United States v. Valdez*, 147 Fed. Appx. 591, 596 (6th Cir. 2005); *United States v. Hodge*, 2017 WL 1345219, at *16 (D.V.I. Feb. 24, 2017).

[76]   *E.g.*, *United States v. Estrada*, 837 Fed. Appx. 106, 108 (3d Cir. 2020); *see United States v. Gagnon*, 230 F. Supp. 2d 260, 271 (N.D.N.Y. 2002) (collecting cases).

Google Translate and other smartphone-translation apps are a relatively recent phenomenon, and their use in the context of consent-searches has only been analyzed in a handful of cases.[77] *United States v. Mendez-Bernal* denied a defendant's motion to suppress evidence for lack of consent.[78] The officer there could not speak Spanish, and used a smartphone-translation to communicate with the defendant and solicit his consent to search the defendant's vehicle. The court concluded that the defendant had in fact consented because the officer was able to communicate with the defendant using the app, and because a certified translation of the conversation indicated the defendant's consent.[79]

Likewise, in *United States v. Salas Antuna*, the district court denied a defendant's motion to suppress evidence found during a consent search where the officer used a smartphone-translation app to solicit the defendant's consent.[80] Noting precedent that an officer need not use the term "search" when asking a suspect for consent, the court found that the officer's use of the question "*¿puedo buscar?*" (which literally means "may I look for?") was sufficiently clear to communicate the officer's request for consent.[81] Even while noting that the translation was "legally

---

[77]   *E.g.*, *United States v. Garcia-Garcia*, 957 F.3d 887, 892 (8th Cir. 2020); *United States v. Cruz-Zamora*, 318 F. Supp. 3d 1264, 1268-70 (D. Kan. 2018); *United States v. Mendez-Barnal*, 2020 WL 6495109, at *12 (N.D. Ga. July 22, 2020); *United States v. Salas Antuna*, 2017 WL 2255565, at *12 (S.D. Tex. May 23, 2017).

[78]   2020 WL 6495109, at *11.

[79]   *Id.*

[80]   2017 WL 2255565, at *4-5.

[81]   *Id.*

imprecise," the court held that the officer acted in good faith and therefore that the evidence should not be excluded.[82]

By contrast, *United States v. Cruz-Zamora* found that an officer's use of Google Translate was so deficient as to render invalid a suspect's consent.[83] There, the court found that Google Translate was unreliable, produced several "literal but nonsensical" translations, and caused confusion on several occasions.[84] Further, the court acknowledged expert testimony discussing the meaning of the phrase used ("*¿puedo buscar?*") and that it was not possible to tell whether the defendant had understood the nonsensical translation as a question or as a statement.[85] The defendant there also did not physically indicate his consent to the search.[86]

The evidence in *Cruz-Zamora* did not show that the defendant knew English or had anything more than a basic grasp of the officer's questions.[87] While noting that the defendant had complied with the officers requests in English that the defendant produce his license and registration, the court held this was insufficient to satisfy the government's burden in light of the transcript and Google Translate's imprecision.[88] The Court then determined that the good-faith exception to the

---

[82]   *Id.* at *5.
[83]   318 F. Supp. 3d at 1270.
[84]   *Id.* at 1267, 1270.
[85]   *Id.* at 1270.
[86]   *Id.* at 1271.
[87]   *Id.*
[88]   *Id.*

exclusionary rule did not apply and suppressed the evidence found in the defendant's vehicle.[89]

Here, Ramirez-Mendoza argues that she did not voluntarily consent to the search of her vehicle here because she did not understand to what she was consenting, and because Conrad's request to search her vehicle was not framed as a question but as a statement of fact. The Government responds that Ramirez-Mendoza's testimony should be disregarded, that her understanding of English can be inferred from the fact that she responded to several questions in English, that her knowledge of what a "search" is can be inferred from the prior search of her vehicle in Arizona, and that Google Translate was both reliable and accurate.

The Government has not met its burden of proving that Ramirez-Mendoza provided consent to the search of her car. First, the record shows that Ramirez-Mendoza did not understand Conrad's request to search her car as it was phrased in English. The Government makes much of Ramirez-Mendoza's ability to answer two questions in English. But her responses were to simple questions posed *in Spanish*. Further, the Government's arguments are undermined by the early portion of the stop where Ramirez-Mendoza incorrectly answered Conrad's question of where she was from, spoke in very broken English, and then ultimately resorted to Spanish. Additionally, nothing in Ramirez-Mendoza's background, such as education or

---

[89] *Id.* at 1270-72.

length of time spent in the United States, would suggest she has a strong grasp of the English language.

Second, the Court is not convinced that Google Translate accurately translated Conrad's request for consent into Spanish. The Government bears the burden of proof, but failed to introduce any evidence showing that the word "*registrar*" actually means "to search." Unlike in cases such as *Salas-Antuna* or *United States v. Leiva* which found the word "*buscar*" sufficient to communicate to a suspect that an officer would like to search her property,[90] the Court has no legal or factual basis for interpreting the term "*registrar*" in a similar manner. Precision is important, particularly in this context, and the Court believes that more was needed to establish the accuracy of Google Translate.

Moreover, even if the Court credited the transcript's translation, it would not be enough to bear the Government's burden. While the transcript tends to prove that Ramirez-Mendoza knew that Conrad intended to search her car,[91] the translation would still undercut the Government's case as the transcript shows that Google Translate revised Conrad's question into a statement. As a statement that one "like[s] to search" is significantly more coercive than a request, this alone would not be enough to establish voluntary consent. The transcript thus presents strong evidence

---

[90]   821 F.3d at 818.
[91]   The Court notes that, without information regarding the nature of Ramirez-Mendoza's consent to the Arizona search (i.e., what words were used, in what language, under what circumstances), it cannot infer Ramirez-Mendoza's understanding or knowledge of the term "search" based solely on this past experience.

of coercion which would suggest that Ramirez-Mendoza felt unable to refuse given Conrad's declaration.

Third, the Court declines to infer that Google Translate accurately translated and communicated Conrad's request to search Ramirez-Mendoza's vehicle solely because it may work well *generally*. A review of the record shows that Google Translate is a useful tool with an alarming capacity for miscommunication and error. That the app can facilitate basic communication does not make it an adequate method for soliciting consent. It need only fail once to obviate a suspect's consent. As a result, the Court cannot hold that Google Translate is sufficiently reliable to presume its accuracy without further verification.

Fourth, the Court declines to discredit Ramirez-Mendoza's testimony and therefore affirmatively finds that she did not understand Conrad's request as it was translated in Spanish. The Court will not discredit her testimony on the basis that she is a "seasoned participant" in the criminal-justice system,[92] and that she provided false identification to Conrad during the stop. The Court believes her criminal history has no bearing on her present credibility and finds her uncontroverted testimony truthful and consistent with the evidence in the record.

Fifth, the totality of the circumstances does not suggest that Ramirez-Mendoza consented to a search of her car. Conrad did not provide Ramirez-Mendoza

---

[92]   Doc. 61 at 5.

with a Spanish-language consent form.[93] Nor did he gesture to the car or physically indicate that he intended to search the vehicle. Further, he did not inquire into whether Ramirez-Mendoza understood him or attempt to explain what he meant. Conversely, Ramirez-Mendoza did not affirmatively demonstrate consent by, for example, opening her car door or showing a willingness to cooperate.

In sum, Conrad's conduct fell below the threshold required of officers when soliciting consent in the face of a language barrier. Conrad placed his faith in a tool whose accuracy he could not confirm and whose reliability had been called into question. It is beyond dispute that Conrad did not know how his words were being translated. But Conrad did not question Google Translate or attempt an alternative method of investigation when it became apparent that the app was periodically producing nonsensical and bizarre translations. Because the moment of consent is so

---

[93] The Court finds Conrad's failure to use a consent form odd. When communication issues are present and a translator is not available, the gold standard appears to be an accurately translated foreign-language consent form which the defendant reads and signs. *See Cedano-Medina*, 366 F.3d at 687; *United States v. Gaviria*, 775 F. Supp. 495, 500 (D.R.I. 1991); *e.g.*, *United States v. Palomino*, 100 F.3d 446, 450-51 (6th Cir. 1996); *United States v. Zapata-Tamallo*, 833 F.2d 25, 27 (2d Cir. 1987); *United States v. Marin*, 761 F.2d 426, 433-34 (7th Cir. 1985); *United States v. Guevara-Miranda*, 640 Fed. Appx. 319, 321 (5th Cir. 2016); *United States v. Gonzalez-Ramirez*, 317 Fed. Appx. 790, 796 (10th Cir. 2009); *United States v. Camilo*, 287 F. Supp. 2d 446, 454 (S.D.N.Y. 2003); *United States v. Soto-Teran*, 44 F. Supp. 2d 185, 194 (E.D.N.Y. 1996); *United States v. Hernandez*, 872 F. Supp. 1288, 1296 (D. Del. 1994); *United States v. Tavarez*, 834 F. Supp. 55, 56 (D.P.R. 1993); *United States v. Garcia-Restrepo*, 648 F. Supp. 1188, 1194 (S.D. Fla. 1986); *see also United States v. Hernandez*, 224 F. Supp. 2d 1156, 1160-61 (W.D. Tenn. 2002) (finding no consent where the consent form "contained numerous linguistic mistakes which distorted its content to the point of rendering it nonsensical"); *United States v. Suarez*, 694 F. Supp. 926, 939 n.10 (S.D. Ga. 1988) (holding it inappropriate to use an *English* consent form as evidence of consent where the defendant spoke Spanish and the form was not translated). Conrad has provided no valid explanation for his failure to use such a form and, had he simply employed a consent form, there would be no dispute regarding Ramirez-Mendoza's consent, or lack thereof.

crucial, that a tool *generally* works is not sufficient to infer that the tool is accurate in a particular instance. In the present circumstances, the Court believes that a reasonable officer would have taken steps to confirm that his statement were communicated accurately given the high risk of miscommunication posed by Google Translate. Alternatively, Conrad could have checked his vehicle for consent forms, requested the forms from his station, or simply used the trained dog sitting in his backseat. Conrad failed to do so with virtually no explanation as to why. Accordingly, the Court finds that Ramirez-Mendoza did not provide consent to the search of her vehicle.

### B.     Automobile Exception

Despite the absence of consent to search the vehicle, the Court determines that the search of Ramirez-Mendoza's car falls within the automobile exception to the warrant requirement. The automobile exception "permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'"[94] To determine whether probable cause exists, courts consider whether the historical facts leading up to a search, "viewed from the standpoint of an objectively reasonable police officer," amount to probable cause.[95] The probable cause inquiry "is entirely objective,"[96] and "is 'commonsense,'

---

[94]  *Burton*, 288 F.3d at 100 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)).

[95]  *United States v. Donahue*, 764 F.3d 293, 301 (3d Cir. 2014) (internal quotation marks and citations omitted).

[96]  *Halsey v. Pfeiffer*, 750 F.3d 273, 299 (3d Cir. 2014).

'practical,' and 'nontechnical;' it is based on the totality of the circumstances and is judged by the standard of 'reasonable and prudent men.'"[97] "If there was a 'fair probability that contraband or evidence of a crime' would have been found, there was probable cause for the search."[98]

The Government points to six primary facts that it argues gave rise to probable cause to search Ramirez-Mendoza's car for drugs. This includes that she:

- Was travelling from California to New York, two well-known sources of narcotics;

- Presented a Mexican drivers license which did not appear to be hers;

- Drove a vehicle that was registered in another individual's name;

- Drove a car smelling strongly of air freshener;

- Possessed only a single car key; and

- Possessed two phones.

As Ramirez-Mendoza concedes, these facts are plainly sufficient to establish reasonable suspicion to extend the traffic stop.[99] While Ramirez-Mendoza contests that these facts are insufficient to form probable cause to search the vehicle, the Court respectfully disagrees.

---

[97] *Donahue*, 764 F.3d at 301 (quoting *Illinois v. Gates,* 462 U.S. 213, 230-31 (1983)).

[98] *Id.* (quoting *Gates*, 462 U.S. at 238).

[99] Doc. 38 at 1. *See also United States v. Stewart*, 2021 WL 2478440, at *9 (M.D. Pa. June 17, 2021) (finding the facts that the defendant was driving another person's car, with tinted windows, on I-80, between two known drug sources, and with air freshener, among other things, amounted to reasonable suspicion to extend a traffic stop).

Several observations made by Conrad supported a suspicion that Ramirez-Mendoza was transporting narcotics. First, Conrad detected a strong odor of air freshener emanating from the vehicle.[100] As he testified at the suppression hearing, "where there's a strong odor of air freshener, it's often used as a masking agent where there's a drug possession or drug trafficking-type circumstance. It's believed . . . that strong odor is going to mask any odor from law enforcement or from K-9. So that's typically indicative of somebody that's passing narcotics."[101] Courts are in almost universal agreement that the use of air fresheners in a vehicle is one factor to consider in determining whether probable cause exists, as air fresheners are often used to cover the odor of drugs.[102]

Second, Conrad noted that there was only a single key in the ignition, which is "consistent with drug trafficking organizations that use a vehicle as so-called their work vehicle. A single key is often passed around or left in a location for a mule or trafficker to take that vehicle and take it from point A to point B."[103] This too is indicative of drug trafficking or transportation.[104] Third, Conrad observed two cell

---

[100] Doc. 51 at 23.

[101] *Id.* at 24.

[102] *See, e.g.*, *United States v. Bettis*, 946 F.3d 1024, 1030 (8th Cir. 2020) (noting the presence of "air freshener 'supported a suspicion that [Appellant] was attempting to mask the odor of illegal drugs'"); *United States v. Pena-Gonzalez*, 618 F. App'x 195, 199 (5th Cir. 2015) ("We have long recognized that the presence of air fresheners . . . suggests a desire to mask the odor of contraband"); *United States v. Leyva*, 442 F. App'x 376, 379 (10th Cir. 2011) ("Officers uncovered multiple air fresheners inside the small truck cabin, which this court has held can suggest an intent to mask the scent of concealed drugs").

[103] Doc. 51 at 62-63.

[104] *See United States v. Bams*, 858 F.3d 937, 944 (5th Cir. 2017) (testimony established that "drug traffickers often drive third-party vehicles and thus have only a single key"); *Leyva*, 442 F.

phones which, in his experience, is consistent with drug trafficking as "sometimes the drug traffickers use a working cell phone to conduct their drug transactions."[105] Fourth, Ramirez-Mendoza was driving a vehicle that had recently been registered to a different individual.[106] This was suspicious to Conrad because it is "consistent with a drug trafficking organization that gives a vehicle registered to often, who knows who, to transport narcotics from one place to another."[107] Fifth, Ramirez-Mendoza's rapid trip across the country from California to New York "was right in line of what would have been a drug trafficking [trip]. It goes right in line to the trade craft of a drug trafficking organization."[108]

Critically, these five considerations, while perhaps on their own insufficient to establish probable cause, are accompanied by the fact that Ramirez-Mendoza provided false identification to Conrad.[109] It is well established that providing police with "a false name and photo ID"[110] or other "untruthful and evasive answers to

---

App'x at 379 (a single key in a vehicle's ignition "can sometimes indicate that the occupants may be drug couriers"); *United States v. Calvo-Saucedo*, 409 F. App'x 21, 23 (7th Cir. 2011) (testimony noted "that a single key could mean that the vehicle was a drug courier's 'drop car' which could be left with its cargo at the delivery point for someone else to retrieve").

[105] Doc. 51 at 62. *See, e.g. United States v. Fletcher*, 978 F.3d 1009, 1016 (6th Cir. 2020) (noting that "possession of multiple cell phones [i]s relevant to reasonable suspicion," but "i[s] weak and require[s] more substantially suspicious factors" (internal quotation marks omitted)).

[106] Doc. 51 at 63-64.

[107] *Id.* at 64. *See United States v. Moore*, 795 F.3d 1224, 1231 (10th Cir. 2015) ("The recent registration of a vehicle can contribute to reasonable suspicion"); *United States v. Pettit*, 785 F.3d 1374, 1382 (10th Cir. 2015) (noting suspicion of cross-country trip in "a vehicle registered to an absent third party").

[108] Doc. 51 at 26; *see id.* at 23-26.

[109] Doc. 51 at 16, 60.

[110] *Bettis*, 946 F.3d at 1030. *See also United States v. Syrkett*, No. CRIM. A. 95-307, 1997 WL 419621, at *2 (E.D. Pa. July 3, 1997) (noting that the use of "false identification furnished

police questioning could support probable cause."[111] The provision of false identification, combined with the other five issues previously identified,[112] was sufficient to create a fair probability that contraband or evidence of a crime would be found in the vehicle that Ramirez-Mendoza drove and, accordingly, Conrad had probable cause to search that vehicle pursuant to the automobile exception. Consequently, the Court finds that the search of Ramirez-Mendoza's vehicle was constitutional.

## III.   STATEMENTS

The Court further denies Ramirez-Mendoza's motion to suppress statements made while stopped on the highway and speaking with Conrad. The Fifth Amendment holds that no person may "be compelled in any criminal case to be a

---

probable cause to believe the vehicle had been used in violation of the Controlled Substance, Drug, Devise, and Cosmetic Act").

[111] *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019). *See also United States v. Harvey*, 16 F.3d 109, 112 (6th Cir. 1994) (concluding, among other factors, that "the false information given to the officers regarding the car's ownership" supported a finding of probable cause).

[112] The Government contends that probable cause is further supported by Ramirez-Mendoza's "claim that the car had been checked by police for illegal items with a dog in Flagstaff, Arizona in an apparent effort to avoid a search of the vehicle." Doc. 33 at 32. Not only is the final portion of that sentence an assertion without support in the record, but Ramirez-Mendoza offered that her vehicle had been searched only in response to a question posed by Conrad, and she offered that a dog had been involved in the search only after Conrad asked whether a dog had been involved. Doc. 51 at 24-25. As such, the Court finds nothing suspicious about this statement. Furthermore, while the Government asserts that it was suspicious that Ramirez-Mendoza slowed her vehicle "down significantly when the Corporal was following the vehicle," Doc. 33 at 32, commonsense indicates to the Court that most individuals who are speeding—as Ramirez-Mendoza was—would slow down significantly when they notice a police officer turn on to the road and begin pursuing them. As such, the Court does not find this behavior suspicious or supportive of probable cause.

witness against himself."[113] Police officers who subject a suspect to in-custody interrogation must warn her of her rights pursuant to *Miranda v. Arizona*.[114]

To determine whether a suspect is in custody, courts first set forth "the circumstances surrounding the investigation," and then "ask, as an objective matter, whether 'a reasonable person [would] have felt that he or she was not at liberty to terminate the interrogation and leave.'"[115] In general, when a suspect is detained pursuant to a *Terry* stop, an officer may question her without providing *Miranda* warnings.[116] This rule also extends to routine traffic stops.[117]

The Court finds that Ramirez-Mendoza was not "in custody" when asked to stand by Conrad's window.[118] Ramirez-Mendoza concedes that Conrad had reasonable suspicion to extend the traffic stop, therefore bringing Conrad's questioning into the ambit of a *Terry* stop. Under *Terry v. Ohio*,[119] "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."[120] Because Conrad had reasonable suspicion to suspect that criminal activity was

---

[113] Const. Amend. V.

[114] 384 U.S. 436, 467 (1966).

[115] *United States v. Ludwikowski*, 944 F.3d 123, 131 (3d Cir. 2019) (internal quotation marks and citations omitted).

[116] *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).

[117] *Id.*

[118] *See Caraballo*, 643 Fed. Appx. at 168-69; *United States v. Hargett*, 58 Fed. Appx. 942, 945 (3d Cir. 2003).

[119] 392 U.S. 1 (1968).

[120] *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008) (internal quotation marks omitted) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

"afoot," the Court concludes that the detention constituted a *Terry* stop and therefore that *Miranda* warnings were not required. Consequently, Ramirez-Mendoza's motion to suppress the statements made during the traffic stop will be denied.

## IV.   CONCLUSION

For the foregoing reasons, the Court will deny Ramirez-Mendoza's motion to suppress.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge